Good morning, Your Honor. Leon Hazani and Neville Asherson for Petitioner. Good morning, Your Honor. I'll be arguing the case, Your Honor. Well, can we do both, then? I may well add something to the argument. Well, then, after your co-counsel is through, if he leaves you some time, you can come up. All right. Good morning, Your Honors. May I reserve two minutes for rebuttal time? You only have ten minutes. Two. Two minutes, please, Your Honor. May I begin, Your Honors? Yes, please. I believe that we have a very compelling case here before the Court involving the petitioner, who's a political activist, a fighter against corruption, and an active political person in Armenia who fought against corruption and paid for it very dearly. He was beaten repeatedly, tortured, interrogated, arrested, forced via violence to give up his political opinions. When he refused to do that, he was tortured further, hospitalized, and ultimately fled to the United States for safety. If we accept all that, how do you respond to the changed country conditions conclusion by the I.J.? Well, Your Honor, I think that there's a two-pronged answer to that. First, I don't believe that the I.J. that Petitioner per se has to show that change the country conditions hadn't changed. The reason I state that is because the image you have to show that that factual determination is not supported by substantial evidence. First, Your Honor, I do believe that it is supported by substantial evidence, but I don't think that country conditions have changed. That they haven't changed. And I don't think that it's required in this case. The reason I say it's not required is because Counsel, you've got me totally confused. I thought that the I.J. made a determination, first, of adverse credibility. But even if we assume that he was wrong on the adverse credibility determination, the I.J. said it's safe for him to return. Country conditions have changed. Now, the question is, what is the Petitioner's obligation on appeal to get us to grant relief in the face of that factual determination? What does he have to show? Your Honor, I believe that if you take a look at the immigration judge's decision, which was in part adopted by the BIA, the immigration judge denied asylum in two ways. First, it denied asylum on the basis that his past persecution wasn't severe enough, so that even if there's no well-founded fear of future persecution, that he should still be entitled to stay here because the past persecution was so severe that he has a reason not to want to return. Okay. I understand all that. Would you go to the second prong? The question I'm asking you is the future. As to the second prong, Your Honor, I don't believe that he created a well-founded fear. When he established the past persecution, assuming he's found credible, he established his past persecution. The burden shifts to the government to rebut a presumption of future persecution. And the I.J. apparently concluded that the government had met its burden because he reached the determination that country conditions had changed. I'm still waiting for an answer to my question. Yes. He had to show in the face of that determination in order to show entitlement to relief at the court of appeal. I believe that the finding by the immigration judge wasn't supported by the documentation that was submitted. So it is. The claim is that there's not substantial evidence to support that factual determination. Yes. Thank you. The reason I bring up the other point is because the immigration judge used the erroneous adverse credibility determination to find that he didn't warrant asylum in the United States based upon his past, the severity of his past persecution alone, and then required the petitioner to produce medical documentation to support his claim because she had used faulty interpretation, a due process violation, and other really very, very minor issues to make an adverse credibility determination. If one is to look at the I.J.'s decision, the I.J. says, because I find him to be uncredible, I needed medical evidence to support this past persecution. Did the translation issues impact on the evidence about the changed country conditions at all? I believe that it impacted the entire proceedings. Even the beginning of the case. Did he testify about changed country conditions? He testified that although the names had changed, the players had stayed the same, and the corruption and the political violence and political persecution continued in Armenia. That was supported by the 2001 country conditions report produced by the Department of State, which the government put in. That testimony was pretty clear, wasn't it? I believe so, Your Honor. I would also say... It wasn't really affected by the translation. You have an independent argument on changed country conditions. I think what Judge Wilkin was asking you is, is that independent argument that there was not a change in country conditions, is that affected by your argument as to translation problems? Well, I believe that may have been. The BIA fled from the faulty translation argument. They themselves refused to adopt the attack on the faulty translations regarding the organizational names. And in doing so, they effectively said, okay, we're going to be able to carve out where there was faulty translation and where there wasn't. And I don't see how a judicial body can say, well, we'll say that this portion of the proceedings were affected by faulty translation, but this portion wasn't. Once there was a finding, a faulty interpretation, rather, the finding should have required at the very least remand, if not a finding that he was in fact credible and warranted the relief. Are you giving any time to your co-counsel? I did have one other question, though. I'm unclear as to how he got into the United States. It said he came on a visitor's visa, and yet there seems to be this argument that he came on a fraudulent marriage or a marriage of convenience. Which was it, or was it both? Your Honor, I believe that if one was to take a look at the asylum application and the evidence that was presented, the Petitioner came in on an H-4 visa based upon which he admitted from the get-go in the proceedings what was entered into for the purpose of fleeing the country. It wasn't a case where he received a green card or became a lawful permanent resident through the marriage. He was able to enter the United States on that visa. Visitor's visa? Visitor's visa, I believe, may have come into the record due to the faulty interpretation. But if one was to take a look at the asylum application and the documents submitted in support, he came in on an H-4 visa, which he testified to and his family testified to the fact that he obtained through the marriage, which was arranged only for him to flee the country. What's an H-4 visa? An H-4 visa is a visa, I believe, for the dependent of someone who's coming as a specialty worker. It's also another category of a nonimmigrant visa, Your Honor. And it's a temporary visa? A temporary visa, yes. Well, what do we do with the discrepancy between on the asylum application that he was widowed versus his testimony that he'd entered into a sham marriage and presumably his wife is still lost? Well, the point I would make in that regard is this, Your Honor. First of all, I don't think that there – it's a major discrepancy. And the judge – My wife is dead versus – Make it to the wife. Yeah. I think it's material to the wife. I think it's not material to the claim for asylum. Although – But doesn't it – isn't it kind of important in the credibility determination? You don't think that's a material difference? I don't think it's – I don't think it is, Your Honor, because here the immigration judge speculated that the reason he put her down as widowed on the application was because he was trying to cover up a fraud. That flies – Was he asked about the discrepancy by the immigration judge? Not specifically. He openly – Now, tell me, when you say not specifically, was he yes or no? Was he asked about the discrepancy? Yes. Did the immigration judge say to him, can you explain why you said widowed? Yes. But only – Where? Tell me where. No, the judge didn't ask that specific question, Your Honor. He didn't ask that question, right? Yes. Did he ask him to explain the discrepancy? No. Okay. That's what I thought the answer was. Not yes, but no. Yes. It got in the entire range. Well, the Petitioner openly – openly stated, including his mother and father, from the get-go of the proceedings, that the marriage was entered into for the purpose of him to flee the country. So if anything, even if there was a fraud in this case, it was recanted immediately. And I think that the Petitioner coming into court and testifying, look, I entered into this marriage for this purpose, and his mother and father are doing the same, isn't a material misrepresentation. I think it would speak more clearly to perhaps clerical error or some type of misunderstanding rather than fraud. He came into court – Okay. The devil made me do it. Right. He never – he never hit the ball on this issue, Your Honor. That's part of the range of explanations. Okay. You save two minutes for rebuttal. Thank you, Your Honor. May I please report? My name is Ryan Bounds. I'm the – I will represent the Respondent and the Sonata, the Attorney General of the United States. I'd like to correct a couple of misrepresentations that the Petitioner's counsel made in his opening argument. First, it is not the case that the Petitioner here came forward and admitted his misrepresentation of his marital status on the I-589. He did admit that he was not widowed but divorced, but he did not admit that the wedding – the marriage that he had entered into was for fraudulent purposes until it was pressed upon him when it was – when it became clear rather late in his testimony that he had entered into this marriage without having met the woman before and while he was still in the hospital. So it is – He volunteered that. Nobody said – what kind of marriage was this? Was it – why did you get married? He didn't volunteer it, in fact. It was asked, how did you marry someone who was still in the hospital? Yeah. And then he said, I had no other choice. I was leaving. But it wasn't – it wasn't the case that he – he misrepresented his marital status on his I-589. And he admitted that that was misrepresented, but he never admitted – Where did he admit – where did he admit he was something – He said he was widowed, when in fact at the time he was still married. Where did he say, I misrepresented something on the form? He did not until he was pressed on it. No, no, no. Where did he say, yes, I misrepresented something on the form? I'm not sure that he ever admitted it in so many words. No. There was never any reference to the form in the hearing. That's not true. He was asked why he said he was widowed in his form by the – I think by the representative of the IRS. Where is that? I don't have the page citation. I can look for it. No, no, not a case citation. Page citation. Let me help you both. Transcript 67 and 68, ER 148 and 49, is when he's cross-examined by the IR – or the INS counsel. Is that what you're referring to? Yes. You are? What does it say? The INS counsel, as best I can recall off the top of my head, is why he indicated that he was widowed. Go right ahead. Just start there. Okay. Anyway, to continue – Yes, tell me. Do you have the transcript? I can give it. Okay. All right. Now, tell me where – look at the page. It's 67 – no, it's 148, 149. And tell me where he was asked about why he said he was widowed, why he put something on the form, or how he explains the discrepancy. He only explains why he undertook the discrepancy in his briefing. We – To this court. All right. I asked you about the hearing. At the hearing, he was not asked by the I.J. or any attorney, how do you explain the discrepancy between the form and your testimony about the marriage? Is that correct? I may be misrecollecting. The explanation may only have been in the briefing. But he did address the discrepancy. In the briefing. I'm not interested in the briefing. We do have a rule, as you may know, that for credibility finding, to rely on it, if you rely on a discrepancy, you have to give the witness an opportunity to explain the discrepancy. Very well. I will note that there is no dispute. The only excuse that the Petitioner has offered, even in his briefing, which goes to the prejudice analysis, is that he was advised to lie on the form I-589 by a non-lawyer. And that he then – he then attempted to – he then says that he corrected it at his hearing. But he did not, in fact, correct it at his hearing. He admitted that he was not widowed and that he was, in fact, divorced, but only recently, when he was, in fact, married, not widowed, when he filled out that form I-589. And he did not admit that the reason he made that misrepresentation was because he was afraid of having his fraudulent marriage discovered. Ever. Is there any law on the question of, let's say, hypothetically, that someone really was in legitimate fear of his life and then lied on a form to save his life? Would that – is that something that we should – which way does that cut, in other words? This Court has recognized that fraudulent documentation used to enter the United States in flight from persecution cannot be a grounds for – cannot always, will not always be a grounds for an adverse credibility determination. In this case, however, the form I-589 was filled out three years after he had entered the United States. So this is not exactly flight from persecution. It was also filled out on the advice of someone. And the erroneous misrepresentation was not ever corrected in a forthcoming way, as the Judiciary's counsel attempted to represent in his opening argument. Let's get for a moment, at least, to the changed country conditions, which Judge Tolman asked about, asked her opponent about. On page 13 and 14 – no, page 13, I guess, of the IJ's report, let's see if it starts at 12 and 13. Of the oral decision? Of the oral decision. The Court notes that there have been changed circumstances. And then he gives two reasons. He gives one, that the man who was the president of his organization now supports Mr. Karcharian's government. And two, that the A&M is no longer in existence. Correct, Your Honor. Now, can you tell me how that differs from the case of Melkonian and the country conditions that were presented to the Court in that case? Melkonian, or are you talking about Mamouzian? Is it Mamouzian? This is Melkonian. This is Melkonian. There is a Melkonian case, but it's not this one. Yeah. You're talking about Mamouzian, I presume. Yeah. Mamouzian. That was a decision that you wrote in 2004, as I recall. And that case did represent – did relate to country conditions in Armenia. The only difference there is that because of the timing of that case, the Court was relying on 1998 country condition reports. But wasn't the president changed by then? Actually, he was forced to resign in 1998, as the country conditions report that is relevant to this case notes. And, in fact, the position – But the A&M was no longer in existence at the time of the other case, Mamouzian. It was no longer in existence when you wrote your decision for the Court in Mamouzian. It was in existence in 1998, which was the year the country condition report related to for purposes of that case. This hearing was held in 2002, so we're dealing with a 2001 country conditions report, which represents the A&M had been disbanded and the president had been forced to resign. And, in fact, the petitioner, in his oral testimony to the IJ, acknowledged that the A&M was no longer in power, acknowledged that the president was no longer there, and, in fact, said that the country conditions had changed a lot. So he could not represent which party the president of Armenia belonged to now. I've looked at the country reports, and they sound almost identical as to the problems that exist. One says arbitrary arrests and detention without warrants are common. And, quote, members of the security force would chain-link detainees between arrest and interrogation. The other one, the current one that we're talking about, says members of the security forces routinely beat detainees during arrest and interrogation. That's word for word. Arbitrary arrests and detention is a problem. The petitioner in this case- The petitioner first. I mean, we go to one- I don't want to be in Armenia any more than you do. I'm not going to argue it's a lovely country. That's not the basis of the persecution decision. I'd rather be there than in Dar es Salaam. The petitioner's argument is he was persecuted because of his activities on behalf of a democratic organization via NPO or NDU. And now the country conditions, whatever the country conditions report samples that you want to cite from, are such that the head of that organization that he was a member of and that was the basis of his alleged persecution now supports the government. And he admits that. And so I don't quite understand how the court can rely on, you know, citations from a country conditions report to say it's the same. In fact, his own organization would not say so. Well, he said, though, that the people who were persecuting him, who had previously been members of the party that no longer existed, still had positions in government. He actually does not say that. He makes a conclusory statement without any expansion. I'm not sure what he means by the people are still the same. Those same people may- We don't know what he means by anything at all since the translator was so faulty. He says that the people are still the same. Those people may still be in Armenia. He also acknowledges, however, the government has changed. He acknowledges that the president, ahead of the ANM, which is what he was fleeing, no longer is in power. He acknowledges the head of his organization supports the current president. The country conditions report makes quite clear that the head of the internal affairs ministry, which is the ministry that allegedly persecuted him, has been tried and convicted of murder. There is no doubt that the people are not the same. And he acknowledges himself that the country conditions have changed, quote, quite a lot or a lot. So he could not say which party the president now in power belongs to. So we cannot credit his summary, conclusory, unexpanded statement that the people are the same. Speaking of crediting, when it sort of struck me that the BIA was kind of striking the comments that the I.J. had made about the mistakes in the acronyms and so on. Yes. But then I guess sort of made its own independent finding that even without that grounds for credibility that the I.J. arguably relied on, that they would make their own decision that he was not credible based on the remaining grounds. Yeah, on the remaining grounds. Not quite right. What they said was the I.J. based the adverse credibility determination on a number of factors. The I.J. did not need to rely on the factors of the apparent misrepresentation or the apparent mistranslation of the Armenian political party names into English abbreviations. And so they said even without that. And can the BIA make separate credibility determinations? Yes. And you are reviewing the decision as rendered by the BIA. Well, we don't, I'm afraid, have time to review the five or six items. Can I just say in parting that the. . . You've talked about one, the widowed, which he wasn't given a chance to explain and which may or may not be material to his fear or central to his claim, as we say. Is there any other principle one that you think shows lack of credibility? Yes. His failure to describe in any meaningful detail his duties on behalf of the democratic organization that he represented. His misrepresentation of his leadership role or his evasiveness about his leadership role. And as the I.J. specifically noted, his tendency to exaggerate or shade the truth on what his actions were. So he said he went to make a complaint to the DA about his mistreatment in 1993, even though he was still in the hospital. And when that was pointed out, he admitted he didn't do it. His friends did. The I.J. specifically noted that. If I say I went to federal court when somebody says to me, you know, I'm a businessman and I feel I'm cheated, and I say, well, what did you do about that? And you say I went to federal court. Does that mean you went personally rather than you had somebody file a claim? I went to file a complaint. No, no, I didn't went to file a complaint. That's what he said. He didn't say I went to the DA or, you know, I had my day in court or any other such idiom. He said I went to file a complaint with the DA. Or he said something that caused the translator, who had difficulties, to translate it in that way. I do want to emphasize that the Petitioner himself has never, and certainly never before the I.J. or the Board, nor did his counsel ever say that the translator was having problems. The Petitioner was asked and specifically said he understood the translator. And the Petitioner, even before the Board, only said that the translator was having problems translating Armenian political party names into English abbreviations. There was no claim. There has never been any claim that there were, you know, general mistranslations. And there's no basis for making that determination. Kennedy. Well, there's one I remember at some length about when he was trying to explain what his job was and to put plenipotentiary, they took a representative and then they took a recess and the translator came back and said, I think he's saying plenipotentiary. So there was at least that, I certainly know. There was some to and fro about what exactly his title was for the organization. But that does not go to sort of the general ability to represent his quotidian activities on behalf of the organization or any of the injuries that he suffered or anything like that. So I don't think that that quite rises to the level of pervasive translation errors. No such errors were ever claimed. And this Court has specifically held, as Perez-Laster in 2000 noted, that isolated translation errors do not give rise to a due process violation, which is what the Petitioner is now arguing, in order to avoid the consequences of having failed to challenge the IJ's changed country conditions analysis. His exact response was, did you report this incident to anybody? Yes, I went to the DA on January 30th. Yes. And that was obviously not the only ground for the adverse credibility determination, but it is one of them. The overall tone, the IJ is in a position to evaluate the credibility of the witness in the first instance, and the IJ noted that based on that sort of exaggeration and shading, other instances of evasiveness and lack of detail, that the Petitioner was not credible. They all sound, you know, fine when you talk about them generally. But for instance, the IJ says his testimony is evasive, but doesn't report the question asked correctly. The question was not what parts of your body were treated, as the IJ said, but what were you treated for in the hospital. And the answer to that question was, you know, I was treated for injuries to various parts of my body and I had a concussion and loss of memory. And he finds that evasive. He was asked, I can't remember if it was by representatives of the INS or by the immigration judge or even by his own counsel, but there were efforts to get from him specific enumerations of his injuries, and he basically resorted to all of them. The only question I see that they ask for that is what were you treated for in the hospital. And I found that answer not only not evasive, quite specific. And I could go down the list with you as to the things that the IJ said were evasive. Well, I would urge the Court not to lose sight of the fact that even if he were the most credible witness under the sun, country conditions have changed in Armenia, and he has not challenged it, and this Court has no jurisdiction to consider whether he has challenged the unchanged country conditions. So he could be credible and still not have shown his. Absolutely. Those are two separate arguments, and he has to prevail on both. Yes. Yes. Thank you. And he also has to show that he raised it sufficiently in his. Exactly. For the BIS. Thank you, Your Honor. Your Honor, if I can just rush through a few issues. First of all, I believe that the government misrepresented this case in regards to the interpreter. Even the BIA essentially refused to adopt portions of the IJ's decision because of an interpreter problem. Those are at several places, but just in the administrative record on page 123, the interpreter didn't know the difference between what a mayor was or the district attorney. Was there any forum in which the petitioner could have come forward and said, oh, by the way, when I said, when I was translated as saying this, what I really said was that, and it should have been translated as the other? In fact, the issue was raised by family members during the proceedings. I know, but afterwards, could he have actually quarreled afterwards with a translation and said, no, what I really said was this? Well, one would he has, I mean, this is all orally done. He doesn't understand English. His family members who spoke Armenian were excluded from the proceedings. He doesn't know what was going on. I know that later at some point he saw the transcript and someone could have translated it to him, and he could have then said, that isn't actually what I said. Was there any forum in which he could have made that correction? Well, I believe he attempted to make that correction at the BIA. I think the BIA agreed with him, but then refused to do the appropriate thing, which was to remand for a new proceeding or to reverse the credibility determination. And the credibility determination is based on these faulty interpretations. I think it's, you know, laughable that the government's position, you know, hinges on semantics, such as I went to the DA when the faulty interpretation is clear in this case. He explained clearly that he had representatives file the complaint for him. The marriage, I believe, was nonmaterial, and he was truthful and straightforward about it and was never given an opportunity to respond to the I-589 application. Widower remark, as the Justice has pointed out. What's your response to the government's argument that you waived the changed country conditions issue by not adequately raising it in your brief? Well, we would dispute that, first of all, because the country conditions report, which was the basis of the changed country conditions finding, as Justice Reinhart points out, holds that the corruption in human rights abuses continues. That doesn't answer the question. The gentleman asked you what's your answer to the government's assertion that you waived the issue by not raising it properly in your brief before the BIA? Your Honor, I believe that the — it wasn't waived in the brief before the BIA or before this Court. I believe that although not artfully stated, it was brought up that he continued to fear return to Armenia, and he testified to that. I believe it was briefed at the BIA, not artfully, I do admit, and it was briefed at the Ninth Circuit. And in Mimousian, which was written by you, Justice Reinhart, I think this very issue of artfully bringing forward that issue — I'm not stating it at all. And I — and can you cite to me where in your brief to the BIA that you actually raised the issue with regard to country conditions? The Petitioner was represented at the BIA pro se, and I would just point out that I think a general reading of his brief would indicate that — Well, there are two places it's mentioned. Can you tell the gentleman what those two places are? Yes. Do you think that raises it adequately? Then if you want to get on to a separate point, that he's pro se and that that should be enough, but he asked you what the facts are as to where it is raised in the brief. I don't have the BIA brief in front of me, but it's extremely — it's a very limited brief. I believe — Okay. We can look at it. I believe the general feel is that it was stated in there and that he was a pro se applicant doing the best he could. And in the Mimouzian decision, this Court recognized that asylum involves issues where one potentially could pay for with his life if it's not granted. And I think the minor discrepancies or perhaps inartful or inarticulate way of explaining certain issues should be found in favor of the Petitioner in this case, as was held in Mimouzian. And in regards to the changed country conditions, I believe this Court also has the right to take judicial notice of even the 2006 Department of State country conditions report, which state the same things are happening now. The decision in Mimouzian deals with country conditions reports, which find that the corruption, the political persecution, the political violence continues. And the government keeps pressing the issue that he was vague about his torture. He testified that when he — after he was beaten and begged for water, he was asked to drink his own blood after having his nose bashed in with a chair. I don't believe that that is vague or ambiguous at all, and I don't think it supports the finding of the credibility determination here. Thank you, counsel. The case just argued will be submitted. The Court will take a brief morning recess. Thank you.
judges: Reinhardt, Tallman, Wilken